# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Wendy L.D.*, 2017 IL App (1st) 160098

---

| | |
|---|---|
| Appellate Court Caption | *In re* Marriage of WENDY L.D., n/k/a WENDY L.S., Petitioner-Appellant, and GEORGE T.D. III, Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-16-0098 |
| Filed | February 10, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-D-010469; the Hon. Naomi Schuster, Judge, presiding. |
| Judgment | Affirmed; sanctions denied. |
| Counsel on Appeal | Grund & Leavitt, P.C., of Chicago (Marvin J. Leavitt, David C. Adams, and Jody Meyer Yazici, of counsel), for appellant.<br><br>George T.D. III, appellee *pro se*. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Rochford and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1    Petitioner-Appellant Wendy L.D., n/k/a Wendy L.S. (Wendy), appeals from the December 31, 2015 order awarding custody of the parties' children to respondent-appellee George T.D. III (George). For the following reasons, we affirm the ruling of the circuit court of Cook County.

¶ 2                        BACKGROUND

¶ 3    The parties were married in 2001. The parties had three children (the children): G.D., born in October 2002; R.D., born in November 2003; and B.D., born in August 2006. Notably, all three of the children have been found to have emotional problems. Further, both R.D. and B.D. have a record of behavioral problems and have been diagnosed with disruptive mood dysregulation disorder and oppositional defiant disorder, respectively.

¶ 4    Wendy filed for divorce in 2008. On September 28, 2010, the circuit court entered a custody judgment awarding Wendy sole custody of the children (the custody judgment). The custody judgment provided that the children's primary residence would be with Wendy, but granted George parenting time each Tuesday afternoon through Wednesday morning, as well as alternating weekends.

¶ 5    A "summer vacation time" provision of the custody judgment specified that each parent would have at least two uninterrupted weeks of time with the children during their summer recess from school, and that, if there was an extra week or more of summer recess in which the children were not enrolled in camp, such days would be split evenly between George and Wendy.

¶ 6    The custody judgment recited that the parties agreed to "consult with each other concerning major health and education matters with a view to arriving at a harmonious policy" but that, if they were unable to reach an agreement, Wendy shall have ultimate decision-making authority. The judgment specified that both parents were permitted to attend the children's regular medical appointments and that Wendy was to use her best efforts to inform George of medical appointments in advance.

¶ 7    The custody judgment acknowledged Wendy's intent for the children to attend North Shore Country Day School (NSCD), a private school, and specified that both parents had the right to attend school-related events. In a separate provision, the parties agreed to confer about "any disciplinary or behavioral problems *** with the goal of maintaining a united front to the children in matters of discipline."

¶ 8    The custody judgment also provided that "Each parent shall encourage the children to have a warm and loving relationship with the other parent." The parties agreed not to disparage the other parent to the children or to "attempt to curry favor with the children to the detriment of the other parent."

¶ 9    The parties agreed that the children would be raised in accordance with George's Roman Catholic faith, but specified that they would not be required to participate in religious activities during Wendy's parenting time except for certain one-time events, such as confirmation.

¶ 10    The parties were divorced in October 2010 in an order that incorporated the custody judgment.

¶ 11 In October 2011, the court entered an "Agreed Order Amending and Supplementing Custody Agreement" (the October 2011 order), which modified the custody judgment provisions concerning parenting time during summer vacation. The October 2011 order specified that, in the event that the children's summer vacation included an extra week or more when the children were not in camp, George "shall have the first half of any extra full week or more and Wendy shall have the second half" and that "the exchange between the parties shall occur at 12:00 p.m. if there are an odd number of days or 5:30 p.m. *** if there is an even number of days, such that each party receives an equal allocation of time." The October 2011 order also added that "Wendy shall have the children in all years from the day that school lets out until 9:00 a.m. on the Saturday following the dismissal of school for summer recess." The October 2011 order otherwise provided that "All other terms and provisions of the September 2010 Custody Agreement shall remain in full force and effect."

¶ 12 In October 2012, George filed a petition to modify the custody judgment pursuant to section 610 of the Illinois Marriage and Dissolution of Marriage Act (Act), claiming that changed circumstances warranted a modification of the custody judgment to award him sole custody. See 750 ILCS 5/610 (West 2014). George's petition claimed that since the custody judgment, Wendy had engaged in "increasingly bizarre and erratic" behavior and "a relentless campaign to alienate the children" from George.

¶ 13 Among other acts, George claimed that on three occasions in 2012, Wendy had made false allegations of abuse against him, leading to unnecessary investigations by police and the Illinois Department of Children and Family Services (DCFS). Although each DCFS investigation was deemed to be "unfounded," George claimed Wendy had misrepresented these DCFS investigations to the children's medical personnel and teachers. George also claimed Wendy had repeatedly made "bizarre and unnecessary calls" to police that caused mental anguish to the children and disrupted his parenting time.

¶ 14 George also claimed Wendy had refused to communicate with him regarding the scheduling of medical appointments, school meetings, and other activities, and had requested that medical providers not allow George to attend medical appointments. The petition also alleged that Wendy refused to participate in family therapy, against the recommendation of the children's school.

¶ 15 George's petition further claimed that the changed circumstances of the children supported custody modification, insofar as all three children now suffered "emotional problems," and that R.D. and B.D. had behavioral problems, which had led to R.D.'s expulsion from NSCD in 2011. The petition sought sole custody, claiming Wendy's animosity toward George prevented her from encouraging a close relationship between the children and their father.

¶ 16 In March 2013, the court appointed Dr. Louis Kraus to conduct an evaluation of the family pursuant to section 604(b) of the Act (750 ILCS 5/604(b) (West 2012)). Over several months, Dr. Kraus conducted numerous interviews with George, Wendy, and the children, as well as various other medical professionals and school personnel.

¶ 17 Dr. Kraus completed his evaluation over a year later, in a report dated May 22, 2014 (the May 2014 report). Dr. Kraus noted this was the longest it had taken him to complete an evaluation, as he had reviewed "the most voluminous amount of information ever given to me for an evaluation."

¶ 18    The May 2014 report detailed a history of abuse allegations by Wendy against George, occurring both before and after the 2008 divorce and 2010 custody judgment, none of which could be substantiated. According to the May 2014 report, Wendy claimed that George "had been physically and emotionally abusive to the children and to her" during the marriage and that she was fearful of George. Wendy reported to Dr. Kraus several incidents of threatening behavior by George in the months leading up to her filing for divorce in October 2008, including claims that he attempted to hit her with a car in August 2008. She claimed that in December 2008, George had pointed a box cutter at her and "angrily thrust the blade" through a sofa, in the presence of the children. George denied these acts and told Dr. Kraus that Wendy's behavior in the time period was "paranoid."

¶ 19    In January 2009, George was served with an *ex parte* order of protection. The order of protection was withdrawn on January 27, 2009. According to the May 2014 report, Wendy told Dr. Kraus that she agreed to withdraw the order of protection based on George's representation that he would stay away from her. According to George, the order of protection had been withdrawn during a hearing at the urging of the court, as the court presiding over the matter found Wendy's allegations to be "absurd." George claimed that the order of protection was not based on any actual threat by him, but that Wendy simply wanted to force him to leave the marital home.

¶ 20    Over several years, on a number of occasions, Wendy's allegations of abuse led to investigations by police or DCFS, none of which resulted in findings of wrongdoing by George. For example, in February 2, 2009, "there was an event where [R.D.] was kicking the front seat of the car and that George reported pushing his leg down, although [R.D.] said he had hit his leg. Wendy described this as a sprained knee and that R.D. was unable to walk." Dr. Kraus's May 2014 report noted that police and medical records from the incident indicated that (contrary to Wendy's claim), R.D. had no sign of injury and was able to walk. The May 2014 report also states that the DCFS investigator "noted in her report that [Wendy] had lied to her."

¶ 21    On another occasion, in April 2012, a DCFS investigation was prompted by an incident where Wendy "walked into [R.D.'s] school saying that [R.D.] had a horrible weekend with his father." According to DCFS, the school principal reported that R.D. "mentioned something happened with [George] during visitation but the special education teacher does not believe that [R.D.] is being truthful," since R.D. "was using [Wendy's] language and did not seem authentic."

¶ 22    Dr. Kraus's May 2014 report emphasized that, although there were numerous other alleged incidents, "there are no DCFS findings other than unfounded, only allegations which were not supported." The May 2014 report states: "The allegations of abuse have stemmed now for years. When one attempts to actually substantiate these *** there really is not clear support of what [Wendy] is saying."

¶ 23    Apart from the allegations of abuse, the May 2014 report describes numerous conflicts after the October 2010 dissolution of marriage, including conflict over Wendy's alleged efforts to exclude George from meetings with the children's teachers and medical professionals. George reported that Wendy did not consistently let him know when appointments were scheduled, or that she scheduled appointments at times when she knew he would be working.

¶ 24    This issue was highlighted by R.D. and B.D.'s mental health issues and related behavioral difficulties, such as refusing to go to school, throwing tantrums, swearing, and threatening school personnel. These problems led to R.D. being removed from NSCD in December 2011. B.D.'s behavioral issues subsequently led to Wendy's decision to remove him from NSCD in January 2014. As of May 2014, both R.D. and B.D. went to North Shore Academy (NSA), a public special education school for students with emotional and behavioral problems.

¶ 25    The May 2014 report found that Wendy had requested George's exclusion on at least one occasion. In January 2012, following his removal from NSCD, R.D. was admitted in a "day hospital setting" at Alexian Brothers Behavioral Health Hospital (Alexian Brothers). The record includes an Alexian Brothers form completed by Wendy in January 2012, in which she blamed R.D.'s behavioral problems on his "bad relationship with his father" and averred that George's "parenting style is authoritarian which has been hard on [R.D.] physically and psychologically." In that form, Wendy also reported to Alexian Brothers that George's "behavior has also been very tough on his mom who was granted a protective order against him."

¶ 26    A June 2012 affidavit from an administrator at Alexian Brothers stated that George had been excluded from group therapy sessions at Alexian Brothers, at Wendy's request. Dr. Kraus's May 2014 report opined that Wendy had "use[d] the argument that she was fearful of [George] as a way to keep him away from medical and psychological services for the children."

¶ 27    The May 2014 report also noted conflicts arising from Wendy's resistance to begin family therapy or to locate additional individual therapists for the children. In April 2013 (approximately six months after filing his petition to change custody), George filed a petition for family therapy, which had been offered by NSA. The court eventually entered an order on August 1, 2014, appointing Michael Wagrowski, a therapist at NSA, to provide family therapy. Although Wagrowski worked with R.D. and B.D. individually, the family therapy did not occur. Dr. Kraus's subsequent October 2014 report acknowledged that Wendy "did not want family therapy through [NSA]" and "It's unclear whether or not she actually wanted family therapy."

¶ 28    Separately, although NSCD had recommended on October 9, 2013 that B.D. see psychiatrist Dr. Louis Weiss, Wendy did not set up any appointments until George filed an emergency motion on November 25, 2013, resulting in a court order on December 12, 2013, directing her to do so. The May 2014 report also noted that Dr. Kraus thought counseling with both parents would be helpful, but that Wendy was not interested.

¶ 29    In addition, Dr. Kraus's May 2014 report noted a conflict as to whether Wendy had failed to support the children's Catholic religious upbringing, as had been agreed to in the custody judgment.

¶ 30    Dr. Kraus' May 2014 report found that both parents were capable and that all three children had "positive relationships" with their mother. However, the May 2014 report opined that "her behaviors are having a negative impact on not only the children's relationship with their father, but on the children."

¶ 31    The May 2014 report found that George had shown "he has the capability of parenting and making key decisions for the children," noting that Wendy "would likely have that ability if she wasn't as focused on villainizing" George. Dr. Kraus noted: "I have strong

concern over [Wendy's] ability to encourage a relationship between [the] children and their father." He opined that "Wendy has not done a good job in regard to being the sole decision maker for the children." Although she had done a "reasonable job" in regard to educational decisions, Dr. Kraus opined she "had some difficulty regarding mental health intervention *** in a collaborative way" with George, and found some "resistance on her part to acknowledge some of the mental health concerns of the children."

¶ 32      Dr. Kraus opined that overall George was "more consistent" in working with the children's caregivers and educators, and that George "has a greater capacity to encourage a relationship with the other parent." The May 2014 report recommended a "50:50 split of residential time" but opined that George should have custody with respect to major health and educational decisions.

¶ 33      Michael Bender was appointed as the children's representative in July 2014. At his request, the court entered an order calling for Dr. Kraus to update his May 2014 report. After conducting additional interviews with the parents in September 2014, Dr. Kraus submitted his updated report, dated October 8, 2014 (the October 2014 report).

¶ 34      The October 2014 report described an improved attitude by Wendy. Wendy had now admitted "that George had never been physically abusive to her" and "she does not feel he is any type of risk to the children." She also told Dr. Kraus that she "felt that both she and George were great parents" and that "her intention was not to exclude George, but understood how one can perceive the issue that way."

¶ 35      According to the October 2014 report, Wendy acknowledged "for the first time that her behaviors have, in part, negatively impacted the situation." Dr. Kraus reported that he had spoken with Wagrowski at NSA, who "reported that both parents have been working far more consistently with each other, have come to school meetings and have been less argumentative."

¶ 36      The October 2014 report noted George's "skepticism" that Wendy was "only acting in this idealized way because they are approaching trial" and that she had been "coached" as to what she should say. Dr. Kraus recognized "there could be some truth to what George's concerns are" but he opined that Wendy had genuinely shown improvement in cooperating with George.

¶ 37      However, the October 2014 report stated that conflicts had continued between the parents. George reported to Dr. Kraus that "several times there was a new program or a person involved in the treatment team [and] somehow there would be a new allegation of child abuse, repeating old history as far back as 2009." The October 2014 report states that "Wendy acknowledged this somewhat as the case, but said that there had been no reports to DCFS *** since 2012."

¶ 38      The October 2014 report also indicated that Wendy recently had begun individual therapy, and that she had contacted a behavioralist to work with the family, as previously recommended by Dr. Kraus.

¶ 39      Dr. Kraus opined that "even though it's taken a while, I believe that Wendy understands" and her behavior had changed "not necessarily because of the court case at hand although that may have been the precipitant. She is seeing that her prior behaviors may have negatively impacted the children and more important, her current behaviors have shown to be positive."

¶ 40    The October 2014 report concluded that, with "certain caveats," Dr. Kraus now recommended (unlike his May 2014 report) that Wendy retain sole custody of the children. Among the caveats, the October 2014 report recommended that George should have more time with the children and that there should be joint participation by the parents in medical and educational appointments. He also recommended individual therapy for both parents and family therapy. Dr. Kraus emphasized that "things cannot return to where they were" and that he would "support revisiting my prior recommendations" if Wendy resumed making "unfounded allegations" or "attempts at removing George from involvement with the children."

¶ 41    In addition to Dr. Kraus's reports, the court granted Wendy's request to submit a custody evaluation from her expert witness, Dr. Alan Ravitz, a child psychiatrist. Dr. Ravitz issued his custody evaluation on September 24, 2014, which was not entered into evidence, although he later testified at trial about his conclusions.

¶ 42    The court conducted a trial on George's petition between October 2014 and August 3, 2015, including over 30 days of testimony. George, who is not an attorney, represented himself at trial. In addition to offering his own testimony, George called Dr. Kraus and several other witnesses.

¶ 43    On questioning by George, Dr. Kraus agreed that Wendy first expressed her changed attitude in meetings with Dr. Kraus in September 2014. Dr. Kraus agreed that his October 2014 opinion was made with "caveats," in part, due to George's expressed concern that Wendy "was changing her behavior and what she was saying to me simply with the hopes that I would change my opinion" from his May 2014 recommendation. He acknowledged it was "reasonable" for George to have concern about the "genuineness" of Wendy's conduct but reiterated his opinion that Wendy was sincere in acknowledging that she had made some mistakes and realized that the parents' conflicts had negatively impacted the children. He opined that she had shown "a progressive level of improvement."

¶ 44    George also called Sheena Selvey, R.D.'s fourth and fifth-grade teacher at NSA, who agreed that George "seems to have a good relationship" with R.D. and that George had attended school events and teacher-parent meetings. Selvey also testified that Wendy was responsive to requests by the school, that she was an "engaged" parent and had a good relationship with R.D.

¶ 45    Ann Bystedt, the principal of NSA, testified that she had observed both parents' interactions with R.D. She testified that George's relationship with R.D. was "a pretty typical one," and that R.D.'s interactions with George were "very positive on many days" but other days were "very challenging." She also testified that Wendy had been responsive and agreed that her presence was "helpful" to R.D. Bystedt agreed that as of April 2013, the family had not taken part in family therapy, because Wendy had not agreed to participate.

¶ 46    Michael Wagrowski, a therapist for both R.D. and B.D., testified that he had observed George and R.D. to have "typically positive interactions" and could not recall any negative interactions between R.D. and George. Wagrowski also described a positive relationship between Wendy and both R.D. and B.D.

¶ 47    After George rested his case, Wendy called Dr. Ravitz as a witness. Dr. Ravitz testified that he had been retained by Wendy in late August 2014 and had been asked to do a custody evaluation "very quickly." Due to time constraints, his report in this case was not as detailed as his usual practice. Although he had interviewed the parties and the children, he did not

have time to contact collateral sources of information (such as the children's teachers or therapists).

¶ 48 Asked about the impact of a potential change in the children's parenting schedule, Dr. Ravitz testified that the "key factor" for the children was not the parenting schedule, but "the parents' ability to cooperate with each other." He cautioned that one could not assume that the children would benefit "just by switching the kids from spending the majority of their time with Wendy to spending the majority of their time with George."

¶ 49 Dr. Ravitz testified he felt Wendy had made many very good decisions for the children with regard to their education and treatment. He opined there should be "no immediate changes" in custody but instead recommended "a treatment program that would involve both parents with a gradual increase in the amount of time that the boys spend with their father." Dr. Ravitz testified that eventually the children "could have essentially a 50/50 relationship" with each parent.

¶ 50 Wendy testified in her case in chief. On questioning by her counsel about her response to the May 2014 report, Wendy stated that she now believed "That I was not actually fearful of George but *** it was more intimidation. And that the things that I said to some of the providers I shouldn't have said." She testified that the May 2014 report "was the moment that I realized the effect that my comments had had" and that "I needed to do a much better job and change the way I was communicating *** to eliminate those inappropriate comments and fears that I had had and to communicate in a much more effective and nonjudgmental way." She also testified that she had followed all of Dr. Kraus's recommendations, including contacting a behaviorist to work with the children and arranging for R.D. and B.D. to see psychiatrists.

¶ 51 After Wendy rested her case, on August 3, 2015, the children's representative called George and Wendy as witnesses.

¶ 52 At the close of trial, George, Wendy, and the children's representative submitted closing briefs. The submission from the children's representative argued that there should be no change in custody, as there was no evidence that the children's mental health issues were caused by Wendy's decision making. The representative argued that Wendy had carefully responded to the children's needs, and that given her understanding of the children, it was not in their best interest for her role in decision making to be reduced.

¶ 53 The children's representative acknowledged there had been "times when mother did not consult with the Father" but that Wendy now asserted that she consulted with George. The representative noted that the court was "in the best position to determine the credibility of this assertion." The children's representative opined that "with two special needs children *** a change in residence would not be in their best interest" because they need "consistency." Thus, he recommended that, if any change in custody was made, the court should award the parties joint custody but the children should retain their primary residence with Wendy. However, the representative agreed that George's parenting time should be increased.

¶ 54 Wendy's closing brief included the argument that, because George's October 2012 petition to modify custody was filed within two years of the October 2011 order, he was required by section 610(a) of the Act to "meet the initial threshold of showing serious endangerment" to the children to seek a modification and that he had failed to do so.

Wendy's closing brief otherwise argued that under section 610(b) of the Act, George had failed to demonstrate that changed circumstances warranted a change in custody.

¶ 55    On December 31, 2015, the trial court entered a 125-page order and judgment that granted George's petition to modify custody, after setting forth in great detail the witness testimony, as well as numerous exhibits documenting communications between the parents regarding the children's education and health care.

¶ 56    In making its ruling, the trial court rejected Wendy's legal argument that George was required to allege or prove "serious endangerment" under section 610(a) of the Act, which at the time provided that "no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health." 750 ILCS 5/610(a) (West 2014).

¶ 57    The court rejected Wendy's contention that the two-year period under this provision should be measured from the October 2011 order. The court recognized that the October 2011 order "set an adjustment to the original custody judgment" but described this as "an agreed order regarding summer parenting time" which "did not create a new custody judgment." As George's October 2012 petition to modify custody was filed more than two years after the original September 2010 custody judgment, the court concluded that George was not required to plead or prove serious endangerment under section 610(a).

¶ 58    The court proceeded to find that a change in custody was warranted. The court recognized that section 610(b) of the Act requires proof by "clear and convincing evidence" of changed circumstances, such that modification is necessary to serve the best interests of the children. 750 ILCS 5/610(b) (West 2014). The court found that the circumstances as of December 2015 were "dramatically different" from the circumstances as of the September 2010 custody judgment. The court noted that as of the September 2010 custody judgment, the children were only 4, 6, and 7 years old. The court found that unforeseen "significant developmental concerns" had arisen in the ensuing years, particularly with respect to R.D. and B.D.

¶ 59    The court also found that Wendy's circumstances had changed, insofar as Wendy had chosen "to alter her court ordered compliance" with provisions of the custody judgment requiring cooperation with George on educational and medical matters. The trial court emphasized its doubts about Wendy's credibility, noting her "inability to remember or recall incidents and events" and her claimed inability to understand "uncomplicated inquiries" when she was questioned by George, but that she had no such difficulties when questioned by her own attorneys. Thus, the court made a "general finding that the testimony of [Wendy] was suspect." The court specifically found that Wendy had "determined that she was not going to confer with [George] to discuss educational issues" and failed to confer with him about disciplinary or behavioral problems, in violation of the 2010 custody judgment.

¶ 60    The court also emphasized that Dr. Kraus's May 2014 report expressed concerns over Wendy's ability to encourage a relationship between the children and their father, as well as her resistance to acknowledge some of the children's mental health concerns. The court recognized that Dr. Kraus's October 2014 report had retreated from his May 2014 recommendation that custody be awarded to George. However, the court noted that "Dr. Kraus did not have the benefit of sitting through the balance of the trial, observing the demeanor of [Wendy] and hearing the testimony that I have heard." The court found that

there was clear and convincing evidence to establish a substantial change in circumstances, noting it had considered "extensive testimony of the parties, *** and hundreds of pages, exhibits and matters this court took judicial notice of."

¶ 61    The court's December 31, 2015, ruling proceeded to recite each of the best interest factors set forth in section 602 of the Act (750 ILCS 5/602 (West 2014)), before concluding that the best interests of the children would be served by George having sole custody. With respect to the children's mental health, the court credited the May 2014 report that George "has been more consistent" and more reasonable in working with mental health professionals. On the other hand, the court found that Wendy "delayed getting an outside therapist" for B.D. The court also found that George had made "numerous attempts *** to engage in family therapy and *** divorce counseling" but Wendy refused to participate, to the detriment of the children. The court also found that Wendy at times had failed to provide accurate information to the children's medical providers, particularly in making allegations against George.

¶ 62    The court emphasized that the "strongest factor" in favor of changing custody was Wendy's "failure, unwillingness or inability to facilitate and encourage a close and continuing relationship between [George] and the children." The court found that Wendy had acted with a "goal of minimizing the role of [George] in the children's lives" and that her decisions "strongly impacted the welfare of the children."

¶ 63    The court found "[a]ny minimal change in her approach after October 2014 is encouraging but suspicious to the extent that when she is not under the watchful eye of this court, her prior practice of excluding [George] I suspect to resume." The court noted that, although the October 2014 report indicated Dr. Kraus's view that Wendy now understood the consequences of her actions, Wendy "was at the same time telling Dr. Ravitz that she was fearful of [George] and had in part not changed her behaviors."

¶ 64    The court proceeded to find that it was in the children's best interest to grant George sole custody, with ultimate decision-making authority on major health and education matters. The order specified that the children would reside primarily with George but granted Wendy parenting time from Wednesday afternoons through Friday mornings, in addition to alternating weekends.

¶ 65    On January 13, 2016, Wendy filed her notice of appeal from the December 31, 2015, order. After Wendy filed her appellate brief, George filed a motion for sanctions against Wendy, claiming that her appeal was frivolous. Our court took that motion with the case.

¶ 66                                           ANALYSIS

¶ 67    We have jurisdiction under Illinois Supreme Court Rule 304(b)(6), which provides for jurisdiction over a custody judgment or modification of such judgment pursuant to the Act. Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016).

¶ 68    On appeal, Wendy raises two main challenges to the trial court's order based on the provisions of section 610 of the Act, which governed modification of custody at the time of the 2015 proceedings. 750 ILCS 5/610 (West 2014).[1]  First, she contends that the court erred

_____

[1]As of January 1, 2016, provisions regarding the modification of an order allocating parental responsibilities appear in section 610.5 of the Act. Pub. Act 99-90 (eff. Jan. 1, 2016) (adding 750 ILCS 5/610.5).

- 10 -

in concluding that George was not required to plead or prove "serious endangerment" in order to seek modification of custody, pursuant to section 610(a) of the Act. 750 ILCS 5/610(a) (West 2014). Separately, she argues that the court erred in finding, pursuant to section 610(b) of the Act, that George proved by clear and convincing evidence that a custody change was in the children's best interests. 750 ILCS 5/610(b) (West 2014).

¶ 69   We first address Wendy's argument premised on section 610(a) of the Act, which at the time provided that: "Unless by stipulation *** no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health." 750 ILCS 5/610(a) (West 2014).

¶ 70   Wendy argues that George's October 2012 petition was made earlier than two years after the custody judgment, in light of the October 2011 agreed order amending the 2010 custody judgment. In other words, she argues that the applicable "custody judgment" for purposes of section 610(a) is the October 2011 agreed order, rather than the original September 2010 custody judgment. As a result, she claims that George had to meet the threshold showing of "reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health." 750 ILCS 5/610(a) (West 2014). She proceeds to argue that George's affidavit in support of his October 2012 petition did not meet this requirement.

¶ 71   We reject this argument, as we agree with the trial court that the relevant "custody judgment" was the September 2010 custody judgment, rather than the October 2011 agreed order. As noted by the trial court, the October 2011 order "set an adjustment" with respect to summer parenting time provisions, but "did not create a new custody judgment." Our review of the October 2011 order makes clear that it did not purport to make any material change to the parties' custody arrangement, but merely sought to clarify how the parties were to implement the previous agreement to evenly split parenting time in the summer when the children were not in camp. The October 2011 order did not purport to make any substantive alterations to the 2010 agreement. Rather, the October 2011 order specifically stated that, apart from the summer vacation modifications, "All other terms and provisions of the September 2010 Custody Agreement shall remain in full force and effect."

¶ 72   As the October 2011 order did not make any material change to the September 2010 custody agreement, we reject Wendy's suggestion that, for purposes of section 610(a), we must measure the two-year period from October 2011. As George's October 2012 petition to modify custody was filed more than two years after the original September 2010 custody judgment, the trial court correctly concluded that George was not required to plead or prove that the children's environment seriously endangered them pursuant to section 610(a). Thus, we need not separately analyze whether George failed to meet this standard.

¶ 73   Apart from her reliance on section 610(a), Wendy next argues that the court erred in finding that George had met his burden to justify a change in custody under section 610(b). The version of section 610(b) in effect at that time[2] provided:

_____

[2]Former section 610 of the Act has been repealed. As of January 1, 2016, the Act now provides, in section 610.5, that "the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either

- 11 -

"The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, or in the case of a joint custody arrangement that a change has occurred in the circumstances of the child or either or both parties having custody, and that the modification is necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 2014).

¶ 74    "Section 610(b) of the Act allows a noncustodial parent *** to bring to the trial court's attention a change in circumstances and seek a reassessment of whether, in light of that change, modification of custody is necessary to serve the child's best interest." *In re Marriage of Rogers*, 2015 IL App (4th) 140765, ¶ 60.

¶ 75    Former section 602 of the Act, which was in effect at the time of these proceedings,[3] provided that in determining custody "in accordance with the best interest of the child," the court shall consider "all relevant factors including *** (3) the interaction and interrelationship of the child with his parent or parents ***; (5) the mental and physical health of all individuals involved; *** (8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602 (West 2014).

¶ 76    "Determining custody in a particular case is a matter which rests with the sound discretion of the trial court." *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 557 (1998). Accordingly, we apply a very deferential standard of review. Our supreme court has explained:

"The standard of review of custody modification judgments is the manifest weight of the evidence. [Citation.] The trial court is in the best position to review the evidence and to weigh the credibility of the witnesses. [Citation.] In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. [Citation.] Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the court's order. [Citation.] A custody determination, in particular, is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child." (Internal quotation marks omitted.) *In re Marriage of Bates*, 212 Ill. 2d 489, 515-16 (2004).

In this case, viewing the evidence in the light most favorable to George, we cannot say the court's decision to modify custody was against the manifest weight of the evidence.

¶ 77    Wendy asserts a number of arguments as to why George failed to prove by clear and convincing evidence that a custody change was in the children's best interest. Among these, she argues that there were no material changes in circumstances. With respect to the court's finding that the children's circumstances had changed, she argues that the children's increased ages cannot constitute a sufficient change in circumstances. With respect to the court's reliance on the mental health issues that had emerged since the 2010 judgment, she

_____

parent and that a modification is necessary to serve the child's best interests." Pub. Act 99-90 (eff. Jan. 1, 2016) (adding 750 ILCS 5/610.5(c)).

[3]Section 602 of the Act was repealed by Pub. Act 99-90, § 5-20 (eff. Jan. 1, 2016).

argues that the original judgment gave her decision-making authority on health care matters, and that it is "absurd to retroactively limit the scope" of her decision-making authority to "educational or medical issues that the children may have been dealing with" at the time of the custody judgment.

¶ 78     She also argues against the court's finding that her behavior demonstrated material changes in her circumstances. She asserts that "a parent's conduct is irrelevant" in determining the children's best interest unless such conduct is shown to have affected the children, and she claims that George did not demonstrate the relevance between her alleged misconduct and the children's best interests.

¶ 79     Wendy notes that both Dr. Kraus and Dr. Ravitz opined that Wendy had made good parenting decisions. She claims that George did not actually disagree with her decisions, but only "disagreed with her methodology." She argues that "[a]t most, George demonstrates that *he* had not been included satisfactorily in the decision making process in the past" and that he "offered no alternatives to any decisions that Wendy had made."

¶ 80     Wendy also emphasizes the evidence of her improved attitude and behaviors following the May 2014 report. She contends that "faults and inadequacies of the custodial parent in the past that are improved at the time of the custody hearing should not be considered a sufficient basis for a change in custody." She argues the evidence showed "that she had taken steps to address past deficiencies" in her communications with George, citing the lack of "unfavorable evidence" regarding her behavior since August 2014. She notes that Drs. Kraus and Ravitz "commended her improvements" and that they, as well as the children's representative, recommended that she retain sole custody.

¶ 81     Wendy further argues that the court erred in its application of the relevant best interest factors under former section 602(a) of the Act. With respect to factor (3), regarding the children's relationship with their parents (see 750 ILCS 5/602(a)(3) (West 2014)), she notes the trial testimony that she had a good relationship with all three children and argues that the evidence showed that George "had a much more difficult time with R.D." With respect to the factors of "the mental and physical health of all individuals involved" (750 ILCS 5/602(a)(5) (West 2014)), she relies on Dr. Kraus's and Dr. Ravitz's opinions that she made good decisions for the children and that the parties are working more collaboratively to address their mental health issues. With respect to the factor relied upon most heavily by the trial court—the willingness and ability to encourage a close relationship between the children and the other parent (750 ILCS 5/602(a)(8) (West 2014))—Wendy argues "that she actively corrected her past difficulties in including George," emphasizing that Dr. Kraus "reassessed his opinion" from the May 2014 report based on her "concrete improvements."

¶ 82     We find these arguments unavailing, particularly in light of the required deferential standard of review. Viewing the evidence in the light most favorable to George, the trial court could reasonably find that changed circumstances had been proven by George, and that it was in the children's best interest to award sole custody to George (while retaining parenting time for Wendy).

¶ 83     Wendy's argument that she made good decisions for the children and that George merely disputed her "methodology" fails to address the primary thrust of the court's reasoning: that her exclusion of George negatively impacted the children by interfering with their relationship with their father. The court emphasized that the strongest factor in its decision

was the harm to the children caused by her longstanding efforts to alienate George from them.

¶ 84      Notably, Wendy's argument does not dispute the findings that, at least until 2014, Wendy interfered with George's rights under the 2010 custody judgment. Viewing the evidence in the light most favorable to George, the evidence suggests that Wendy engaged in a pattern of alienation, including fabricating claims of abuse in order to distance George from the children. Understandably, Wendy focuses on the evidence that her attitude and behaviors had improved after the May 2014 report. However, under the totality of the circumstances in this case, we cannot say the trial court was unreasonable in finding such evidence unpersuasive.

¶ 85      First, as a matter of credibility, the court was not required to believe Wendy's testimony that, after the May 2014 report, she suddenly realized the negative impact of her past behavior, and thereby made a permanent change. Indeed, Dr. Kraus acknowledged it was reasonable to be suspicious that Wendy had altered her statements and behavior to affect the outcome of the trial.

¶ 86      Furthermore, even assuming she was sincere, her argument suggests the trial court was somehow obligated to give *more* weight to the evidence of her improved conduct since August 2014, notwithstanding the evidence of uncooperative conduct in the preceding years since the 2010 custody judgment. In deciding the petition, the court was free to consider any evidence of changed circumstances since the custody order. Thus, we cannot say the court was unreasonable in finding that the relatively recent behavioral improvements by Wendy, as reported by Dr. Kraus, were not persuasive, when weighed against the ample evidence of longstanding problematic behavior.

¶ 87      We reiterate that the trial court was in the best position to evaluate the witnesses' credibility. See *Bates*, 212 Ill. 2d at 515. In this case, the court heard extensive testimony by Wendy and George on multiple days. After ample opportunity to observe Wendy's demeanor, the court found that her credibility was suspect and found George to be more credible. We will not second-guess those findings.

¶ 88      We acknowledge that the court's conclusions differed from those of Dr. Kraus, as well as Wendy's expert, Dr. Ravitz, and the children's representative. However, this does not mean that the trial court's conclusion was erroneous. "Although is it within the court's discretion to seek independent expert advice, it is well settled that a court is not bound to abide by the opinions or implement the recommendations of its court appointed expert." *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 52. The various experts and consultants are in reality advisors to the court. The court has discretion to accept or reject some or all of the advice within the parameters of what is reasonable under the facts of a particular case.

¶ 89      *Debra N.* is factually similar to this case. In that case, the parents' divorce decree included a joint custody agreement, naming the mother the residential parent of the child and granting the father weekly visitation. *Id.* ¶ 3. The mother subsequently sought sole custody, and the father sought to become the primary residential parent. *Id.* ¶ 6.

¶ 90      At a subsequent trial on custody issues, the court's appointed expert under section 604(b) of the Act acknowledged that the mother had sought to interfere with the father's visitation, but still recommended that the mother have sole custody, with increased parenting time for the father. *Id.* ¶ 12. The mother admitted several of the father's allegations of her attempts to undermine the father's relationship with their child but claimed these were "lapses in judgment or mistakes." *Id.* ¶ 35. After hearing testimony from both parents, the court

- 14 -

awarded the father sole custody, finding that the mother lacked credibility and that she had "engaged in a pattern of interference" and otherwise sought to "alienate [the child] from a healthy relationship with her father and his family." (Internal quotation marks omitted.) *Id.* ¶ 39.

¶ 91     On appeal, our court recognized that "the mere fact that the trial court's custody determination did not correspond to the recommendation of [the expert] does not render its decision against the manifest weight of the evidence." *Id.* ¶ 53. Rather, we held that "[w]here *** the record supports the circuit court's finding that the custodial parent has made attempts to thwart the noncustodial parent's efforts to visit and maintain a close relationship with the child, the court's decision to modify the custody arrangement *** is not against the manifest weight of the evidence and will be upheld on appeal." *Id.* ¶ 56.

¶ 92     The same reasoning from *Debra N.* applies in this case. Although the court's custody disposition did not comport with the court-appointed expert's recommendation, there was nevertheless sufficient evidence to support the change in custody. Thus, under our deferential standard, we decline to find that the trial court's December 31, 2015, custody modification order was against the manifest weight of the evidence.

¶ 93     Finally, we dispose of George's motion for sanctions against Wendy pursuant to Illinois Supreme Court Rule 375(b), which applies if an appeal is "frivolous" or "not taken in good faith, for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994).

¶ 94     George claims that Wendy's appeal lacks good faith, as its contentions "are so unfounded that no reasonable or prudent attorney, or litigant, could honestly suggest that they even warrant consideration." George asserts that Wendy's appellate brief contains "blatantly false" statements mischaracterizing the record. Wendy responds that her appeal cannot be frivolous, since the trial court's custody determination was contrary to the recommendations of the children's representative, as well as Drs. Kraus and Ravitz. She also denies George's claim that she mischaracterized the evidence, arguing that "the fact that George does not believe Wendy's testimony, does not *ipso facto* make it false."

¶ 95     Although we affirm the trial court's order under our deferential standard of review, we cannot say that Wendy's appeal was frivolous, especially in light of the opinion evidence from Drs. Kraus and Ravitz favoring her retention of sole custody. Similarly, although the trial court credited George's testimony over Wendy's, that does not mean her appeal was in bad faith. Thus, although we affirm the trial court's December 31, 2015, order, we deny George's motion for sanctions.

¶ 96     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 97     Affirmed; sanctions denied.