2021 IL App (1st) 210139-U

FIFTH DIVISION
September 24, 2021

No. 1-21-0139

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In Re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of Cook County. |
| RODRIGO d'ESCOTO, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | 2016 D 004314 |
| | ) | |
| JEANNINE IMBRENDA, | ) | Honorable David E. Haracz, |
| | ) | Judge Presiding. |
| Respondent-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's order that modified the parties' allocation judgment with respect to parenting time and allocation of decision-making responsibilities was not against the manifest weight of the evidence.

¶ 2    Respondent Jeannine Imbrenda (Jeannine) appeals from the trial court's January 8, 2021, order that modified certain portions, including parenting time and allocation of decision-making responsibilities, of the Allocation Judgment and Agreed Parenting Plan between Jeannine and petitioner Rodrigo d'Escoto (Rodrigo). On appeal, Jeannine contends the trial

court's findings were arbitrary and did not reflect the best interests of the children. She argues that the trial court completely disregarded the guardian *ad litem's* and section 604.10(b) (750 ILCS 5/604.10(b) (West 2018)) evaluator's findings, which were credible, unimpeached, and uncontradicted.

¶ 3                                    I. BACKGROUND

¶ 4        Jeannine and Rodrigo were married in 2005. During their marriage, two minor children were born, including E.D., who was born in May 2007, and L.D., who was born in June 2013. In May 2016, Rodrigo filed a petition for dissolution of marriage, asserting that there were irreconcilable differences that caused an irretrievable breakdown of the marriage. In May 2018, the trial court entered a judgment for dissolution of marriage and noted the court had previously entered the Allocation Judgment and Agreed Parenting Plan (Allocation Judgment) on September 14, 2017, which remained in full force and effect.

¶ 5        The Allocation Judgment set forth the allocation of parenting time and decision-making responsibilities. With respect to educational decisions, it provided, *inter alia*, that Rodrigo "shall take the lead on all major educational decisions related to the children including but not limited to: choice of schools, tutors, and other significant decisions related to the education of the minor children." With respect to medical decisions, it provided, *inter alia,* that Jeannine "shall take the lead on all medical decisions related to the [c]hildren." The section on medical decisions also provided that the "party in possession of the child shall have decision-making authority over day-to-day medical decisions for the children while they are in his/her possession including doctor visits if the children are sick." As for extracurricular activities and religion, the Allocation Judgment provided that the parties shall jointly decide all issues related

to the selection of the extracurricular activities" and were equally responsible for any religious decisions.

¶ 6      The Allocation Judgment set forth a parenting time schedule, providing for regular, holiday, and vacation schedules. With respect to the regular parenting time schedule, it provided that the children would alternate weeks between Jeannine and Rodrigo. The transition between homes would occur on Monday mornings, with the transition occurring when the children were dropped off at school or camp.

¶ 7                                    Post-Decree Litigation

¶ 8      Shortly after the court entered the judgment of dissolution of marriage in May 2018, the parties filed various motions with the circuit court, including motions regarding summer parenting time schedules and motions requesting the court to enforce orders. In August 2018, Jeannine filed an emergency motion to enforce the Allocation Judgment and reappoint the child's representative wherein she asserted that Rodrigo violated the Allocation Judgment because he unilaterally enrolled E.D. in tackle football without her knowledge or consent. Thereafter, Rodrigo filed an emergency motion to restrain Jeannine from interfering with E.D.'s participation in football. In September 2018, the court entered an order that provided that E.D. should continue to participate in football and both parties should ensure his attendance at practices and games during their parenting times. The order stated that Rodrigo offered to provide transportation to games on Jeannine's parenting time and that the parties should address issues with the child representative, Michael Bender, in accordance with the Allocation Judgment.

¶ 9      Thereafter, in October 2018, Jeannine filed a petition for rule to show cause, *instanter,* and for indirect civil contempt, wherein she alleged that E.D. was injured playing

3

football and that Rodrigo unilaterally determined that he should continue playing even though he was injured. She alleged that Rodrigo violated the Allocation Judgment because it provided that she had the lead on all medical decisions and that after she took E.D. to a doctor for his injury, Rodrigo took him to a different doctor for a second medical opinion and allowed him to continue to play football. In November 2018, the circuit court entered an order that provided, *inter alia*, that any and all post-decree petitions filed by both parties were dismissed with prejudice and that Michael Bender shall act as the parenting coordinator.

¶ 10     In May 2019, Rodrigo filed a petition for rule to show cause and for a finding of indirect civil contempt, in which he alleged Jeannine monitored the communications between E.D. and Rodrigo and she regularly refused to provide transportation for E.D. to his scheduled activities during her parenting time. Thereafter, in June 2019, the court appointed Jay Dahlin as guardian *ad litem* (GAL) for the children.

¶ 11     Rodrigo's Petition to Modify Allocation of Parental Decision-Making
Responsibilities and Parenting Time

¶ 12     In September 2019, Rodrigo filed a petition to modify allocation of parental decision-making responsibilities and parenting time under the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (750 ILCS 5/501) (West 2018) (750 ILCS 5/602.5, 602.7) (West 2018)) (750 ILCS 5/603.5) (West 2018)) (750 ILCS 5/610.5) (West 2018)). He alleged, *inter alia*, that Jeannine monitored and restricted the children's access to him during her parenting time and she was unable to communicate with him in any meaningful manner without injecting high conflict into the situation. He requested the court allocate parental decision-making responsibilities to him with respect to all significant issues affecting the children, including education, medical,

religion, and extracurricular activities. He also requested the court allocate the majority of parenting time to him, with Jeannine having frequent and liberal parenting time.

¶ 13    In Jeannine's response, she asserted that Rodrigo ignored the Allocation Judgment, and she was forced to file post-decree motions due to his repeated refusal to follow it. She asserted that Rodrigo refused to communicate with her and blocked her from communicating with him through email, phone, and text messages and she had to communicate with him through his assistant. She claimed that Rodrigo interfered with her access to the children during his parenting time and refused to allow them to speak with her. Jeannine requested the court deny Rodrigo's petition in its entirety. In Jeannine's supplemental response to Rodrigo's petition, she argued that Rodrigo repeatedly usurped her medical decision-making authority. She asserted that he unilaterally selected a therapist for E.D. without her knowledge and consent and that the therapist he selected had been Rodrigo's and the parties' marital therapist. She stated that she agreed that the Allocation Judgment should be modified and that she should have primary decision-making authority for both medical and educational decisions as well as the majority of the parenting time.

¶ 14    Proceedings After Rodrigo Filed the Petition to Modify the Allocation Judgment

¶ 15    In November 2019, Rodrigo filed a motion to appoint an evaluator pursuant to section 604.10(b) of the IMDMA (750 ILCS 5/604.10(b) (West 2018)). Thereafter, in December 2019, the parties entered into an agreed order whereby they agreed that if their mediation was unsuccessful, Dr. Robert Shapiro would be appointed as the section 604.10(b) evaluator.

¶ 16    On February 13, 2020, Rodrigo filed an emergency motion to compel therapy and incorporate the GAL's recommendation regarding a therapist. Rodrigo asserted that the GAL had recommended therapy for E.D. since November 2019, that Jeannine had rejected Rodrigo's

suggestions for therapists since August 2019, and that Jeannine had rejected the therapist recommended by the GAL. On February 14, 2020, the circuit court ordered E.D. to immediately begin therapy with the physician recommended by the GAL and the court appointed Hollie Sobel as a parenting coach.

¶ 17                                First Appeal:

*In Re Marriage of Rodrigo d'Escoto v. Jeannine Imbrenda,* 2021 IL App (1st) 200883-U

¶ 18        In January 2020, Jeannine filed an emergency motion to compel enforcement and maintain status quo after Rodrigo informed her that he planned to remove L.D. from the British International School of Chicago, South Loop to St. Helen's School for the 2020-2021 school year. Following a hearing, on August 17, 2020, the court entered an order that denied Jeannine's motion and provided that Rodrigo may enroll L.D. in St. Helen's School for the 2020-2021 school year. Jeannine subsequently appealed and on August 21, 2020, we entered a stay of the trial court's order pending appeal and allowed L.D. to remain at the British School until we issued a decision on the matter. In March 2021, we dismissed the appeal as moot given the trial court's January 8, 2021, ruling on Rodrigo's petition to modify, which is at issue here. In that order, the trial court modified the Allocation Judgment "giving Rodrigo sole responsibility for major educational decisions on behalf of the children, with no required collaboration with, or notice to, Jeannine." *In Re Marriage of Rodrigo d'Escoto v. Jeannine Imbrenda,* 2021 IL App (1st) 200883-U, ¶¶ 9-11.

¶ 19                        Guardian *ad Litem's* November 2019 Report

¶ 20        As previously stated, in June 2019, Jay Dahlin was appointed as the GAL for the children. In November 2019, he issued a written report and provided his initial recommendations, which stated as follows. The initial impression of the family dynamic was that

6

the current parenting plan where each parent had equal parenting time and each parent held final decision-making authority on a different area was "dysfunctional in its form and application." He had not "been witness to a single functional conversation" between Rodrigo and Jeannine since his appointment. The rules and routines in each home could not be more different, as Rodrigo was "more open and permissive," and Jeannine was "extremely engaged and regimented." Their medical decision-making philosophies were "diametrically opposed." His initial impression was "to abandon the equal allocation of parenting time" and have one parent act as the primary residential parent. He did not recommend which parent should be the primary residential parent.

¶ 21       In Dahlin's initial report, he also recommended that the parties engage in direct communication using Our Family Wizard and that Rodrigo unblock Jeannine's phone number. With respect to therapy, Dahlin stated that E.D. needed therapy and offered suggestions for therapists. He stated that the parents should not speak negatively about the other parent and should not discuss the litigation, parenting schedule, or interrogate the children as to what happens at the other parent's home. He stated that the disparagement of the other party was a "<u>serious</u> problem that the children are very attuned to, and which is causing them a tremendous amount of stress." (Emphasis in original.)

¶ 22                    Guardian *ad litem's* June 1, 2020, Report

¶ 23       On June 1, 2020, Dahlin issued a second written report pursuant to his appointment. He stated that he investigated the parties' allegations set forth in their filings and had multiple interviews with the parties, their current partners/spouses, the children, the therapists, the teachers, and Michael Bender, who was the former GAL. Dahlin stated in his report as follows. Jeannine's and Rodrigo's communication styles were incompatible. Jeannine did "not respect boundaries, either the boundaries between her home and Rodrigo's, or the boundaries of what is

appropriate to discuss with the children and what is not." Dahlin's area of "deepest concern" with Jeannine's parenting was that she discussed parenting and financial issues with the children "extensively." She "actively and consistently" discussed parenting issues with them, which "place[d] them squarely in the middle of their parents' battles." Both children had "independently reported 'hour long' debriefing sessions after returning home from Rodrigo's house."

¶ 24    Dahlin stated that Rodrigo's assistant conducted most of the written communications with Jeannine, which was a problem, and Rodrigo blocked Jeannine's phone calls. When the parties began using Our Family Wizard in January 2020, Rodrigo started to use direct written communications but his inability to conduct any verbal communication was a serious impediment to co-parenting. There was no evidence that Rodrigo actively disparaged Jeannine to the children but "it was clear that Jeannine is a cause of stress and discord" in his home. The children reported that they were not "supposed to talk about their mom while at their dad's house," and that "while not disparagement, it does send the same message."

¶ 25    Dahlin further stated in his report as follows. Rodrigo "consistently overstep[ped]" his authority, especially on medical issues, noting that he acted unliterally to schedule medical and therapy appointments. Jeannine was often "over-aggressive" in interpreting/enforcing her medical decision making authority and there was "some evidence that Jeannine may be slow to respond to medical issues." Rodrigo would "then attempt to act unilaterally, and Jeannine will object citing her authority—thus sending the parties into a spiral of authority debate/contempt claims while missing the big picture of overall care of the children." The parties agreed in early 2019 that E.D. needed to see a therapist. Rodrigo sought therapy for E.D. with Dr. Gordon and Jeannine objected to the selection "[b]ut nonetheless she offered no alternatives." The matter

lingered until February 2020 when Dahlin was able to secure a therapist for E.D. Rodrigo administered over-the-counter medication to the children, including ibuprofen for E.D. during the football season and melatonin to L.D. to help him sleep, which were appropriate decisions, as "each parent is responsible [for] the day-to-day care of the children while in their possession."

¶ 26    Dahlin also stated in his report as follows. Jeannine often overstepped her authority in attempting to regulate Rodrigo's care of the children in his home," which caused friction between the parties. When Rodrigo attempted to get braces for E.D., E.D. told Rodrigo, " 'That's my mom's decision to make. She has medical.' " This statement was highly concerning because the "children know far more about the divorce and the specifics of the Allocation Judgment than they should." Dahlin stated it was "far more likely that Jeannine is discussing the Allocation Judgment with the children than Rodrigo is." Jeannine "over communicated" and attempted to insert herself during Rodrigo's parenting time" and Rodrigo chose to "deal with this by avoiding further communications."

¶ 27    Dahlin stated that travel records produced in discovery as well as conversations with Jeannine and James Lee, who had been in a relationship with Jeannine, showed that Jeannine traveled extensively when she did not have the children, which was not a substantive issue, as she was free to travel when she did not have them. He noted that her absence from Chicago 50% of the time "inhibited her ability to remain actively and consistently involved in the children's activities and events and lead to some of the communication problems and activity/medical scheduling discord early in the post-judgment years (which in turn lead into many of Rodrigo's unilateral actions)." Dahlin noted that Jeannine's travel had been greatly reduced during the litigation.

¶ 28    With respect to football for E.D., Dahlin stated that Rodrigo unilaterally facilitated E.D.'s involvement with football. Jeannine's objection to E.D. playing football was understandable, "but her position demonstrated a substantive disconnect with E.D.'s personality," noting he loved football "to the point of being defined by it."

¶ 29    As for Dahlin's assessment of the parenting time schedule, he stated that his first impression was that the current 7/7 parenting plan needed to be modified, noting that the parents had "no ability to substantively communicate, or even to have an actual civil conversation, and as such the cooperating and coordination necessary to equally share parenting time is severely lacking." He also stated that modification of the current parenting schedule did not offer any actual solution to their problems and recommended the status quo be maintained, other than changing the exchange time from Monday mornings to Sunday evenings. He stated that transitioning to a slightly deviated schedule such as 8/6 of 9/5 did not accomplish anything because the same issues would continue to exist. Transitioning to a heavily deviated schedule such as 10/4 or 12/2 would reduce inconsistencies and communication problems but neither parent had "demonstrated the parenting strengths or weaknesses to justify such a draconian schedule." Dahlin concluded that "[j]oint parenting requires extensive communication and cooperation between the parents, both of which are sorely lacking in this family."

¶ 30    Dahlin did not recommend modifications to the educational decision-making responsibilities. With respect to medical decisions, he stated that the parties had very different opinions on medical care and Jeannine was "somewhat overreaching in her attempts to apply her philosophies to Rodrigo's home." He stated that "[a]lthough Rodrigo has overstepped his authority on implementing medical plans for children, his actions have generally been well reasoned and in the children's best interests." Rodrigo was "more proactive in addressing

medical issues (therapy, vaccines)" and the current arrangement where one parent makes all education and the other all medical decisions "often creates problems when these issues overlap." He recommended consolidating decision making with one party and stated that the court "may want to consider granting Rodrigo sole authority on the children's major medical decisions." This recommendation was based more on his regarding cross-authority than on any major needs or deficiencies in the parties' individual decision-making processes. Dahlin deferred to Dr. Shapiro for a more thorough examination on this issue. He recommended the parties participate in co-parenting coaching with Dr. Hollie Sobel.

¶ 31          Dr. Robert Shapiro's Written Report – June 27, 2020

¶ 32          On June 27, 2020, Dr. Robert Shapiro, the section 604.10(b) court-appointed evaluator issued a written report on the allocation of parenting responsibility and time. He stated, *inter alia*, as follows. The parties had spent most of the two years post-decree in "ongoing conflict and/or litigation" and had "essentially been engaged in litigation the past four years." He stated that "[i]n many ways they are still married—certainly still caught in some of the raw emotions that undermined their marriage and now undermines their ability to successfully manage their post decree parenting plan." They disagreed about multiple medical issues, including the administration of medicine, a therapist for E.D., vaccinations, and day-to-day health care of the children. The children have had two GALs during the course of litigation, neither of which could resolve the conflict. The children were "warmly and positively" attached to both Rodrigo and Jeannine, both of whom were good parents. Rodrigo and Jeannine falter when they bring their children into the ongoing post-marital disputes, which will not get fixed by court orders or by changes to the parenting plans. He stated that Rodrigo "discourages" the children from talking about Jeannine in his home and both of them "either purposefully or

11

inadvertently" talk in front of, or directly to, the children about this litigation. Shapiro stated that in late June 2020, he received a phone call from Jeannine, during which E.D. told him that L.D. had recently said in an outburst that dangerous action may be taken to produce injury.[1]

¶ 33    Shapiro concluded in his written report as follows. He concurred with Dahlin's findings and conclusions for the most part. He recommended the court make no changes to the present allocation of parenting responsibilities and parenting time, noting that a change from the 50/50 current plan to Rodrigo's proposed parenting time would not be in the children's best interests and would not rectify the problems that occur between the parents. Shapiro proposed 14 recommendations, which included that Jeannine should not micromanage Rodrigo's administration of over-the-counter medication and a therapist should be immediately found for L.D.

¶ 34                    Guardian *ad litem's* Written Supplemental Report

¶ 35    Dahlin issued a supplemental report after Shapiro's June 2020 report was issued, in which Dahlin recommended that the parties maintain the status quo with respect to the current parenting schedule. He also recommended that Rodrigo select all extracurricular activities for E.D. and Jeannine select them for L.D., with the summer activities being determined by the parent in possession. As for medical decision-making authority, Dahlin stated that "[b]ased on Dr. Shapiro's recommendation, Jeannine would retain major medical decision making." He recommended that the parties terminate co-parenting coaching with Dr. Hollie Sobel.

¶ 36    Hearing on Rodrigo's Petition to Modify Allocation of Parental Decision-Making

and Parenting Time

¶ 37                            Jay Dahlin

---

[1] We have rephrased what the child said throughout the order, but the record is agreed upon as to the words the child used during the incident.

¶ 38      Jay Dahlin, who was appointed the GAL on June 27, 2019, testified as follows. He described Rodrigo as a "loving, deeply caring father" who put the children's "best interests above all else." He stated that "I do think that that's what he wants more than anything, to provide a good home for them, provide good education and a loving environment for them." The children had a great relationship with and were attached to him. He described Jeannine as very attentive to the children's needs, very in touch with them, and that she loved the children "a great deal and they love her a great deal." Jeannine had an excellent relationship with the children, and she was very attuned to their education. Jeannine and Rodrigo have "wildly divergent parenting styles," with Jeannine being strict and Rodrigo being more relaxed. In his June 2020, report, he noted that Jeannine's and Rodrigo's communication style were "incompatible."

¶ 39      With respect to medical decisions, he testified as follows. In his June 2020 report, he concluded that Jeannine was "often over-aggressive" in interpreting/enforcing her medical decision-making authority and "at times may lag in implementing [proper] medical care" and may be slow to respond to medical issues. Rodrigo would not react well when Jeannine would "pester[] him about whether he administered melatonin or ibuprofen or day-to-day over-the-counter prescriptions" and felt like he should be left alone on those issues during his time. Rodrigo acted in the children's best interests with respect to their medical needs and his medical decisions were generally well-reasoned and proactive. Rodrigo "identifies an issue and just acts unilaterally and addresses it" and acted "responsibly in terms of the children's needs."

¶ 40      As for therapy, he testified that in 2019, both parents acknowledged that E.D. needed therapy, but it took Dahlin's involvement to actually get him a therapist. With respect to the incident where L.D. made statements in an outburst that serious action may be taken to produce injury, which Shapiro had discussed in his June 2020 report, Dahlin first learned about this

incident when he read Shapiro's report. Jeannine never called Dahlin or Rodrigo to inform them of the incident. If the incident was as serious as it was presented, then Dahlin and Rodrigo should have known about it. He agreed that Jeannine should have immediately sought and obtained a therapist after the incident. Other than calling Shapiro, there was no evidence that from the date of the incident to the date Rodrigo filed his emergency motion for a therapist, Jeannine took action. This was problematic because she had sole medical decision authority. It took several weeks after Shapiro's report came out for L.D. to get a therapist. Dahlin learned from his investigation that E.D. had claimed that L.D.'s statements in the outburst related to L.D. having been denied access to electronics at Jeannine's home.

¶ 41        Dahlin further testified that in his report he stated it was "far more likely that Jeannine is discussing the allocation judgment with the children than Rodrigo," which was still his conclusion. In his report, he stated that Jeannine discussed parenting and financial issues with the children "extensively" and that the children reported that Jeannine "would speak with them extensively" after they would come home from Rodrigo's home. E.D. told Dahlin about a situation when he sat in the car after coming home from Rodrigo's house and E.D. stated that "Mom would question me for an hour about, you know, everything that was going on." In his report, Dahlin stated that E.D. was resistant to getting braces with Rodrigo because it was his "mom's decision to make." This statement from a child was "highly concerning" and one of Dahlin's primary concerns with Jeannine because the children "know far more about the divorce and the specifics of the allocation judgment than they should." He testified that Jeannine had "discussed the conflict with them a lot" and "extensively," which was putting the kids "squarely in the middle of this conflict." When the children were in Jeannine's home, she monitored text and email messages between the children and Rodrigo.

14

¶ 42        Dahlin further testified that both children reported on multiple occasions that they were not supposed to "say their mom's name when they are at their dad's house," and "it upsets their dad to talk about the mom," which was a problem. Rodrigo reported to him in August 2019 that "I can't let her seep into our lives while the boys are here" and that Jeannine's involvement with the kids in any format during his parenting time caused a lot of stress in his house and he actively worked to "sort of keep her involvement out when he has the kids." This was not good for the children because they need to know that they can contact, talk about, or interact with either parent regardless of whose parenting time it was. He testified that there was "a lot to like" about Rodrigo but did not think he had the "willingness and ability to facilitate that relationship," which was one of his weakest aspects in this case. In his report, he noted that there was no evidence that Rodrigo disparaged Jeannine to the children, and they had privacy to speak with her at any time. Asked whether it was fair to say that Rodrigo also placed them "squarely in the middle of their battles" through his more articulate and non-overt communication, he responded, "[h]e does" and "I think the kids are conscious of it" and they were "definitely conscious when their mom does it." When Dahlin first started in the case, Rodrigo would not take communicate with Jeannine directly. Their communication improved since they started using the Our Family Wizard application.

¶ 43        Dahlin testified that E.D. loved football and was his number one interest. Jeannine objected to E.D. playing football because it was a contact sport. In his report, he noted that Jeannine's position "demonstrated a substantive disconnect with E.D.'s personality." Jeannine's support of E.D. playing football "came around eventually." She went to a couple of games and did not attend his practices. Rodrigo took E.D. to practice during Jeannine's parenting time. When Rodrigo would take E.D. back to Jeannine's home after football practice, Rodrigo would

have dinner with E.D. even though he was required to take him directly home under the Allocation Judgment. Dahlin testified that Rodrigo was "going to do his thing" and was "[s]ort of like a habitual line stepper in that regard. And this is sort of like a good microcosm with him." He testified that Rodrigo "will have an agreement and then do his own thing," which was "a problem that reoccurs a lot of the time."

¶ 44       Dahlin further testified that since the entry of the divorce, E.D. was "dealing with a lot of problems" and he agreed that L.D. was in a "crisis." The problems the children were having were due to the parties' conflict and the post-decree litigation.

¶ 45       Although Dahlin's first impression was that the current parenting plan needed to be modified and the parties had serious problems facilitating a 7-7 schedule, he recommended that the court maintain the status quo with respect to the current parenting schedule. He testified that both children really wanted to keep the same schedule and they were adjusted to both communities. He testified that modification would not offer any solution to the problems and would not be in the children's best interests. Dahlin agreed with his initial assessment that transitioning to a heavily deviated scheduled, including a 10-4 or 10-2, would reduce the inconsistencies and communication problems. However, neither parent had "demonstrated parenting strengths or weaknesses to justify such a draconian schedule" and changing the parenting schedule was not going to change any of the underlying issues. He testified that "although there's a lot to like about Rodrigo, if you base the kids with him 80 percent of the time, it would have the effect of essentially eliminating Jeannine as a parent." He also testified that "[d]oing nothing is not a solution." He testified that all qualifiers should be removed from the parties' agreement and that "the more detail, the more qualifiers, the more problems, the more arguments."

¶ 46       As for allocation of parental decision-making responsibilities, Dahlin testified that in his report, he recommended the court consider consolidating the decision making into one parent because that would reduce conflict and acrimony between the parties. He acknowledged he noted in his report that the court "may want to consider granting Rodrigo sole authority on the children's major medical decisions," but that he ultimately deferred to Shapiro for a more thorough examination. Based on Shapiro's assessment, Dahlin recommended keeping the authority for the children's major medical decisions with Jeannine. His initial suggestions that the court may want to consider giving Rodrigo sole authority for medical decisions was based on his concerns regarding cross-authority rather than major deficiencies in the parties' individual decision-making processes. He testified that vesting sole authority on all decision-making with Rodrigo was not going to solve the family problems, which would "exist regardless." He recommended that Rodrigo maintain authority on educational decisions and that Rodrigo select the extracurricular activities for E.D. and Jeannine select them for L.D.

¶ 47                                Dr. Robert Shapiro

¶ 48       Dr. Robert Shapiro, a licensed clinical psychologist, who was appointed by the court to conduct a section 604.10(b) evaluation, testified as follows. Both parents had a warm, bonded, and attached relationship with the children. Rodrigo was attentive, taught the children not to sweat the small stuff, got them to finish their schoolwork, was fun, and played video games with E.D. Rodrigo also talked "too much about the litigation," had shown E.D. court orders, and limited how much the children could talk about Jeannine. Jeannine was structured, focused on nutrition and good sleep habits, and was almost compulsive about making sure the children told the truth and were respectful. Jeannine also talked "way too much about this stuff, either in front of the kids or to the kids," talked to E.D. about "adult stuff," and overcommunicated with her

17

children. Jeannine had an "undercurrent of criticism" regarding Rodrigo in that "my way of feeding you is better" and "my movie choices are better." E.D. and L.D. got more attention from Jeannine than Rodrigo and she was more nurturing.

¶ 49      Shapiro had not witnessed a single functional conversation between Jeannine and Rodrigo during his appointment and they could not communicate or cooperate. In his report, he noted that Jeannine and Rodrigo demonstrated a "remarkable inability to communicate and cooperate in day-to-day minor decisions, let alone some of the more significant decisions in E.D. and L.D.'s lives." Both parents talked about the other parent to the children about information that was not in the children's best interests, and both talked to the children about the litigation. The conflict between the parties flowed down to the children and caused distress. In his report, he noted that the acrimony between the parties negatively affected their development and both children were "struggling with some significant psychological problems." E.D. was "desperately trying to survive the emotional storm" and L.D. was "struggling with some emotional issues," which was demonstrated by the outburst.

¶ 50      Dr. Shapiro further testified that Jeannine talked to the children too much about the conflict between her and Rodrigo. He agreed with the statement in Dahlin's report that Jeannine "does not respect boundaries, either the boundaries between her home and Rodrigo's or the boundaries of what is appropriate to discuss with the children." He agreed with Dahlin's assessments that "Jeannine's biggest issue is with regard to what we're talking about and the appropriateness or inappropriateness of discussing with the children these issues" and that "Jeannine actively and consistently discusses issues with the children which places them squarely in the middle of their parents' battles."

¶ 51 Shapiro also testified that L.D. was "painfully aware" that he could not talk about his mom at his dad's house. In his report, he stated that L.D. told him his dad "Yells and tells me not to talk about mom at his house" and that L.D. said "I asked if he loves my mom, and he said, Don't talk about your mom in this house. Dad doesn't like E.D. to talk about mom either. But it's okay if I talk about dad at mom's house." Shapiro testified that these statements spoke to the level of conflict between Rodrigo and Jeannine. Rodrigo had indicated to Shapiro that "I have a problem with it if they ramble on. Mommy this, mommy that, mommy this. I feel like she is putting her values into my house."

¶ 52 Shapiro testified that in his report, he noted that L.D. indicated that e-learning was easier at Jeannine's house because she sat with him. He testified that L.D. had expressed a preference to spend more time at Rodrigo's home and, at one point, told him he wished he could stay there for two weeks and Jeannine's house on the weekends but that he also wanted "it to be fair." Shapiro testified that a six-year-old would not typically come up with this type of statement and he questioned whether it came from "someplace else." He noted that L.D.'s expressed motivation to have the parenting time that Rodrigo was seeking was driven by L.D. having more toys and being able to play video games at Rodrigo's house.

¶ 53 Shapiro testified that on June 25, 2020, Jeannine called him about L.D. stating in an outburst that serious action may be taken to produce injury. Shapiro told Jeannine that L.D. needed to be in therapy, and Jeannine indicated to him that therapy was "either in the works or was going to take place." She did not ask for a recommendation for a therapist for L.D. A few days later, he spoke with E.D. about the incident, who told Shapiro that L.D. had also made statements during that incident relating to how he was "always bored." Shapiro testified that the connection between being bored and L.D.'s other statements during that incident was his "way of

expressing how upset he is that he is so restricted at mom's house, and he feels he has so much freedom at dad's house." Shapiro did not think L.D. would take dangerous action to produce injury, but that the incident was significant and needed to be addressed.

¶ 54    Shapiro testified that he did not believe that the seven days off, seven days current schedule was dysfunctional or that the parents had serious problems facilitating it. Based on Shapiro's experience, it was his opinion that the parties' problems could not be fixed by court order or by changes to the parenting time. He did not recommend changing the 50/50 parenting time schedule and testified that it was "workable," the children were familiar with it, and it was in the best interests of the children to continue with it. He testified that if he had to choose one parent, he would recommend Jeannine because her availability "and some of her values, not the way she communicates, but some of her values." Shapiro did not recommend any changes to the allocation of parental responsibility. He agreed with Dahlin's conclusion that "joint decision-making on any issue is out of the question" and with his recommendations regarding the allocation of extracurricular activities. Shapiro agreed with Dahlin's recommendation that the parents continue seeing the parenting coordinator, Hollie Sobel. He also testified that even with the help of Sobel, he did not think there was a scenario where Rodrigo and Jeannine would agree on things.

¶ 55                          Jeannine Imbrenda

¶ 56    Jeannine testified as follows. She disagreed with Dahlin's statements that she was often over-aggressive in interpreting and enforcing her medical decision authority, she often overstepped her authority in attempting to regulate Rodrigo's care of the children, and her traveling inhibited her ability to be consistently involved in her children's activities in school. She does not travel anymore, and she would only question the children about what happened at

Rodrigo's house if they had recounted some sort of incident. She acknowledged that the Allocation Judgment had been mentioned to her children indirectly and it was inappropriate. She agreed that the litigation was negatively affecting the children and it would help the children if the parties stopped fighting.

¶ 57    Jeannine testified about the incident regarding L.D.'s outburst as follows. In late June 2020, the children were playing video games downstairs and E.D. came and told her he was very upset because L.D. made statements relating to how serious action may be taken to produce injury. L.D. told Jeannine that he got upset because E.D. was not paying attention to him and would not play with him. Jeannine thought the incident was serious and she was concerned. About 30 minutes after the incident, she called Dr. Shapiro because he was a "neutral" person and could give her mental health advice and she called the parent coordinator, Hollie Sobel. She did not call Rodrigo or Dahlin and acknowledged she "made an error in judgment" by not calling Rodrigo. She testified that it was not due to lack of concern, but that Rodrigo was unreachable, had blocked her phone number, and would take three days to respond to emails. She spoke with James Lees, who was her boyfriend at the time, about the incident and told him that L.D. was being "overly dramatic," and she did not think it was a big deal. She knew she needed to get a therapist for L.D. and from the time of the incident to the date Rodrigo filed the emergency motion to secure a therapist for L.D., she had been in the process of securing one.

¶ 58    With respect to therapy for E.D., she testified as follows. When the parties separated in 2016, they agreed that E.D. needed a therapist. She contacted Michael Bender, who was the court appointed GAL at the time, to see if he had any suggestions for therapists. In 2017, E.D. started seeing Dr. Teresa LaBarre and saw her for about four to six months. Rodrigo refused to take him to therapy and, as a result, the therapist terminated the relationship in June 2017.

Thereafter, Jeannine set up weekly therapy visits for E.D. with the school counselor that lasted until the end of the 2018 school year. From about June 2018 through May 2019, E.D. did not have a therapist. In May 2019, Rodrigo informed her that he took E.D. to see Dr. Gordon for therapy. Jeannine was concerned about Dr. Gordon because he had been their marital therapist as well as Rodrigo's therapist. Jeannine did not secure a therapist for E.D. from May 2019 to January 2020, which was a mistake.

¶ 59       Asked about her concerns with the children when they were in Rodrigo's care, Jeannine testified that she was concerned about their "general needs," including nutrition, as Rodrigo would give L.D. hot dogs all the time. She was also concerned about their bedtimes, hygiene, and homework when the children were at Rodrigo's house. L.D. told her that he did not complete his work at Rodrigo's house because his dad was busy, and he was told to go in his room and figure it out. Jeannine testified that she was concerned with the amount of time the children used electronics at Rodrigo's house and that E.D. informed her that L.D. was on his iPad all day until he goes to bed. Jeannine monitored E.D.'s text messages with his friends and did not monitor his phone communications with Rodrigo.

¶ 60       As for E.D.'s participation in football, Jeannine testified that she had been to several practices and a couple of games, and she initially had concerns about injuries. Asked whether she had emailed E.D. videos of kids getting hurt playing football, she responded that "E.D. and I have e-mailed videos regarding football" and there was "one incident where a high school student was hurt and I had asked E.D. to be careful."

¶ 61        Jeannine testified that "anything that I'm trying to accomplish with Rodrigo for the kids feels like we're in front of a judge. There's no in between. There's no conversation. * * * And we wind up in court every time. And it is—it's not sustainable." She also testified that she

believed she and Rodrigo could "at some point with some help figure this out" and the current schedule and decision-making was sustainable for the children. She acknowledged she told Dr. Hollie Sobel that coparenting coaching probably would not work. Jeannine wanted to maintain the status quo with parenting time.

¶ 62                                    Rodrigo d'Escoto

¶ 63       Rodrigo testified as follows. Less than two months after the parties divorced in May 2018, they returned to court to litigate disputes regarding summer parenting time and football for E.D. Rodrigo had enrolled E.D. in football because he loved it, it improved his confidence, and changed him for the better. After the judge decided that E.D. could play football, E.D. did not believe Rodrigo, so he showed E.D. the court order to convince him, which was the only time Rodrigo showed E.D. a court order. Rodrigo adjusted his work schedule in order to take E.D. to football practices and his business sacrificed so he could help coach E.D.'s team. Rodrigo attended all but a handful of his football practices.

¶ 64       Rodrigo testified that "everything" with Jeannine was in conflict and that "I make a decision, she tells me not to, then she doesn't make a decision. Then I make a decision, it's— even when I legally have a right to make a decision, I am not allowed to make a decision." He testified that Jeannine was "unable to communicate kindly, nicely," "there's always someone to blame," and "[t]here's always a bad—a villain and just—life just happens, and she's unable to accept that." Rodrigo testified that his problems with Jeannine had been cascading down on the children and they were struggling with significant psychological problems. He agreed with Dahlin's assessment that the children were in a "crisis." E.D. had been "in the middle of this," which negatively affected him, and needed therapy since May 2019. Rodrigo decided to get E.D. therapy with Dr. Gordon, whom Rodrigo and Jeannine had both seen before. Rodrigo

acknowledged he did not have authority under the Allocation Judgment to select a therapist, as that was Jeannine's decision, and he should have told her before he took E.D. there. He testified he knew it would cause conflict and "was going to be a big, big thing by me taking action to help my son." Jeannine did not select a therapist between May 2019 and February 2020, when he filed an emergency petition to secure Dr. Jesse Klein.

¶ 65    In early July, Rodrigo learned from Shapiro's report about the incident where L.D. made statements regarding how dangerous action may be taken to produce injury. Rodrigo was shocked and scared and believed L.D. was in a crisis. Shapiro had concluded in his report that L.D. needed a therapist, so Rodrigo filed an emergency petition regarding therapy for L.D., after which a therapist was secured for L.D. He did not think Jeannine really thought L.D. was at risk and the "whole thing was staged." He testified that Jeannine capitalized on L.D.'s "pain and suffering" and put the children "squarely in the middle just so she could win the decision on schools." Rodrigo acknowledged that he had a part in the conflict and that "sometimes, yes, I imagine I'm not perfect."

¶ 66    Rodrigo testified that they have a calendar and chore board at his house, and they eat breakfast and dinner together. He testified that bedtime was "pretty strict" for L.D. and E.D. had a strict bedtime during the week. Rodrigo was currently using the Our Family Wizard application with Jeannine to communicate, which was effective. Rodrigo was requesting a change to the parenting schedule because it would reduce the time the children would be "in the middle of this" and would give them more stability and reduce stress. Neither mediation with a judge nor coparenting sessions with Dr. Hollie Sobel had helped them avoid litigating disputes. He agreed with Dahlin's report that the parties had serious problems facilitating a 7-7 schedule and a heavily deviated schedule would reduce inconsistencies and communication problems. Rodrigo

and Jeannine could not operate under the current Allocation Judgment, and he did not think that they would ever be on the same page with decision-making for the children.

¶ 67                                    Jay Dahlin

¶ 68        At the end of the testimony described above, Jeannine's counsel called Dahlin to testify again, and he testified as follows. The parents had problems with communication and decision making, not parenting time, and it was in the children's best interests to maintain the 50/50 schedule. In Dahlin's three reports, he never suggested modification of the schedule. In his November 2019 report, he "contemplated a potential modification to the schedule early on but didn't recommend anything." In his June 2020 and September 2020 reports, he did not recommend modifying the schedule. He recommended that Rodrigo maintain educational decision-making responsibility and Jeannine maintain major medical decision-making responsibility. He recommended terminating the parents' joint decision-making responsibility on activities, with Rodrigo having sole decision-making on E.D.'s extracurricular activities and Jeannine having sole decision-making on L.D.'s extracurricular activities. He recommended a parenting coordinator.

¶ 69        Dahlin also testified that during the parties' school dispute on transferring L.D. to St. Helen's school, Jeannine used the incident when L.D. made statements in the outburst to "manipulate" a benefit her and took advantage of a situation during litigation to keep L.D. in the school at that time. He testified it was "very, very problematic what she did" but did not think it negatively impacted L.D., as Dahlin believed L.D. should have remained in the British school. He testified that Jeannine put the kids squarely in the middle of her disputes with Rodrigo, that she did so more than Rodrigo, and she instigated arguments more than Rodrigo. Dahlin testified

that "[d]oing nothing is not going to get us anywhere." He testified that the parties had been on better behavior since they had been in litigation.

¶ 70                                    Circuit Court's Ruling

¶ 71        On January 8, 2021, the circuit court issued a written ruling on Rodrigo's petition to modify the Allocation Judgment. The court stated as follows:

"Since its inception in 2016, this case has had a life of its own that has enveloped the parties, the lawyers, the experts, and this court in an ongoing tug of war to meet the best interests of the two minor children. It is a struggle that shifts constantly making it difficult for the evaluators and professionals to be ahead of each turn or change. Even after the 604.10(b) report was finished at the end of June 2020, there have been an additional six months of conflict and disagreement between the parties, not the least of which was the school decision debacle involving the youngest child this past August. The three-afternoon hearing regarding school choice was followed by a far lengthier second trial addressing the above listed matters. In between, this Court and/or the GAL spent many, many hours with lawyers and litigants attempting to mediate a settlement or fashion some partial resolution of the issues. Unfortunately, an agreement was not reached. At this point, the options as presented by the parties' [*sic*] in their closing arguments are to either make small changes and leave the parenting schedule and decision-making judgment largely the same or to make more drastic alterations. After reviewing all the testimony, the exhibits, the 604.10(b) report, and the applicable law, the Court now finds that to do the latter is in the best interests of the children."

The court further stated:

"This Court's experience during the entirety of this litigation including the six months since the 604.10(b) report was released, in conjunction with its finding that the minor children are suffering emotionally from the destabilization caused by their parents' conflict, leads it to step beyond the recommendations of its own expert and the GAL."

The court found the GAL's and Shapiro's factual findings were credible and that Rodrigo was a credible witness.

¶ 72    The court stated that it "acknowledges that both parties have alleged in verified pleadings that the Allocation Judgment needs to be modified." It further found as follows:

"There has been a substantial change in circumstances since the entry of the Allocation Judgment. Specifically, and by way of example, by all witnesses accounts the children are in crisis and the current parenting plan (7 on / 7 off, with each parent holding final decision-making authority on a different area) is dysfunctional in its form and application. The court further finds that the parties have serious problems facilitating a 7/7 schedule."

¶ 73    The court also found as follows. The current parenting plan "created tremendous conflict" between the parties, which negatively affected the children's development. Jeannine had precipitated the majority of the post-decree litigation and she actively and consistently discussed issues, including parenting and financial, with the children, which placed them "squarely in the middle of their parents' battles." Jeannine failed to timely secure a therapist for E.D. and L.D., she undermined Rodrigo's day-to-day decisions as a parent, and attempted to regulate behaviors with Rodrigo's home through the children. Jeannine reasonably objected to E.D. playing football but once E.D. was enrolled by court order, she did not support him in a way that served his best interest. Jeannine "fabricated the degree of L.D.'s suicidal ideation to

gain an advantage in the school dispute." With respect to Rodrigo, he acted in the children's best interests, made well-reasoned decisions in the children's best interests, and proactively sought and procured necessary therapy for each child since the divorce. Rodrigo facilitated E.D.'s attendance at football during Jeannine's parenting time and supported him in his interests.

¶ 74       The court stated it agreed with Dahlin that the "singular concern" was "reducing the inconsistency and communication between the parties" because that was "the source of problems and stress for the children." The court found it was in the children's best interests to transition to a heavily deviated parenting schedule, noting it would reduce the inconsistencies and communication problems in the family. The court agreed with Dahlin's assessment that joint decision-making on any issue was out of the question and the current agreement, with Rodrigo making educational and Jeannine making medical decisions, created problems and consolidated decision making would reduce the acrimony between the parties.

¶ 75       The court concluded that after a review of the factors set forth in sections 602.7 (750 ILCS 5/602.7(b) (West 2020)) and 602.5 (750 ILCS 5/602.5(b) (West 2020)) of the IMDMA, the children's best interests would be served with Rodrigo having sole decision-making authority for all major decisions relative to the children as well as having a majority of the parenting time during the school year, as it would remove the children from the parties' conflict. Specifically, the court ordered the Allocation Judgment to be modified to provide that Rodrigo "shall be solely responsible for all major medical decisions on behalf of the children as defined in the IMDMA" and "shall be solely responsible for major educational decisions on behalf of the children." With respect to parenting time, the court ordered that during the school year, Jeannine "shall have parenting time with the children on alternating weekends from Thursday after

28

school/camp/activity *** through Tuesday morning drop off at school" and Rodrigo "shall have parenting time at all other times." This appeal followed.

¶ 76                                    II. ANALYSIS

¶ 77        We initially address the timeliness of our decision. This case is designated "accelerated" under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), which requires this court to issue a decision within 150 days after the filing of the notice of appeal, "[e]xcept for good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Jeannine filed her notice of appeal on February 8, 2021. The 150-day period to issue our decision expired in July 2021. However, there was good cause for not meeting that deadline. Jeannine's counsel filed a motion for extension of time to file her opening brief, which we granted, and Rodrigo's counsel filed two motions for extension of time to file his response brief, which we granted. Thereafter, on July 7, 2021, we granted Jeannine's counsel's motion for extension of time to file her reply brief to July 16, 2021, after which Jeannine's counsel filed a motion to withdraw. On July 15, 2021, we granted Jeannine's counsel's motion to withdraw and ordered appellant to comply with Illinois Supreme Court Rule 13(c)(5) ( July 1, 2017) within 21 days. There was no response filed to our July 15, 2021, order, so on August 9, 2021, we entered an order that stated we were taking and considering the case without a reply brief. Accordingly, because this case was not ready for our review until August 2021, we find good cause to issue our decision after the 150-day deadline in Rule 311(a)(5). See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 78        Turning to the arguments raised on appeal, Jeannine contends that the trial court's findings and determination to modify the parenting time and the allocation of decision-making responsibilities were against the manifest weight of the evidence.

¶ 79        Section 610.5(c) of the IMDMA, sets forth the standard for modifying a parenting

plan or allocation judgment and states as follows:

> "the court shall modify a parenting plan or allocation judgment when necessary to
>
> serve the child's best interests if the court finds, by a preponderance of the evidence, that
>
> on the basis of facts that have arisen since the entry of the existing parenting plan or
>
> allocation judgment or were not anticipated therein, a substantial change has occurred in
>
> the circumstances of the child or of either parent and that a modification is necessary to
>
> serve the child's best interests." 750 ILCS 5/610.5(c) (West 2020).

Accordingly, the court may modify parenting time or the allocation of parental responsibilities if

a substantial change has occurred in the circumstances of the child or each parent since the

existing allocation judgment was entered and such a modification is necessary to serve the

child's best interests. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43; *In re Marriage*

*of Burns & Lifferth*, 2019 IL App (2d) 180715, ¶ 26.

¶ 80        Jeannine contends that the evidence did not show that there was a change in

circumstances since the entry of the Allocation Judgment that would necessitate modifying the

Allocation Judgment. She asserts that the evidence the court relied upon for its finding that a

change in circumstances had occurred was either known, or could have been anticipated by the

court and the parties.

¶ 81        We will uphold a trial court's finding that there was a substantial change in

circumstances that warranted a modification of parenting time or allocation of parental decision-

making responsibilities unless that finding is against the manifest weight of the evidence. *In re*

*Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 19; *In re Marriage of Bates*, 212 Ill. 2d 489,

515 (2004). Under this standard, we view the evidence in the light most favorable to the appellee

and when there are multiple reasonable inferences, we will accept the inferences that support the trial court's ruling. *In re Marriage of Bates,* 212 Ill. 2d at 516. A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent, or when the finding is unreasonable, arbitrary, or not based on the evidence. *Jameson v. Williams,* 2020 IL App (3d) 200048, ¶ 47. Under this standard, we may affirm the trial court's ruling if there is any basis in the record to support its findings. *In re Custody of G.L.,* 2017 IL App (1st) 163171, ¶ 24.

¶ 82       Here, the trial court concluded that there was a substantial change in circumstances since the entry of the Allocation Judgment and found that the "by all witnesses accounts the children are in crisis," and the current parenting plan was "dysfunctional in its form and application." The evidence supports the trial court's findings. The GAL testified that since the entry of the parties' divorce, E.D. was "dealing with a lot of problems," L.D. was in a "crisis," and that these problems were due to the post-decree litigation and the parties' conflict. Shapiro stated in his report that the parties had spent most of the two years post-decree in "ongoing conflict and/or litigation." Both Shapiro and the GAL testified that the parties could not effectively communicate or cooperate, and the children were negatively impacted by the parties' conflict. Accordingly, based on this evidence, including the parties' post-decree conflict that negatively impacted the children, we cannot find that the trial court's finding that there was a substantial change in circumstances was unreasonable, arbitrary, or that an opposite conclusion is apparent.

¶ 83       We also note that the court stated in its order that both parties had alleged in verified pleadings that the Allocation Judgment needed to be modified. Indeed, in Jeannine's supplemental response in opposition to Rodrigo's petition to modify, she did not argue that there was no change in circumstances since the entry of the Allocation Judgment. Rather, she asserted

31

that she "agrees that the current Allocation Judgment should be modified—and it is she who should have primary decision-making for both education and medical issues" and the children should spend the majority of their time with her, subject to reasonable parenting time allocated to Rodrigo.

¶ 84　　Next, we address the trial court's finding that it was in the best interests of the children to modify the parenting time to give Rodrigo the majority of the parenting time during the school year. Jeannine contends that there was no evidence that supported the trial court's conclusion that modifying the parenting schedule would reduce conflict or serve the children's best interests. Jeannine argues that the GAL and Shapiro agreed in the assessment that the parenting schedule should not be modified, and it was not in the children's best interests to modify it. She asserts the trial court completely disregarded their recommendations.

¶ 85　　The court must allocate parenting time and decision-making responsibilities according to the best interests of the child. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43; *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. To determine the child's best interests for the allocation of parenting time under section 602.7(b), the court must consider all relevant factors, including:

> "(1) the wishes of each parent seeking parenting time;
>
> (2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;
>
> (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the

offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7(b) (West 2020).

A trial court is not required to make explicit findings on each factor, nor is it required to refer to every factor. *Jameson,* 2020 IL App (3d) 200048, ¶ 47.

¶ 86    The trial court is in the best position to assess the credibility of witnesses and to determine the child's best interest. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45. As such, the trial court has broad discretion in determining issues relating to the allocation of parenting time and decision-making and its judgment is afforded great deference. *In re Custody of G.L.,* 2017 IL App (1st) 163171, ¶¶ 24-25; *In re Marriage of Debra N. & Michael S.*, 2013 IL App (1st) 122145, ¶ 45. As a reviewing court, we will not disturb a trial court's ruling on the allocation of decision-making responsibilities or parenting time unless that decision is against the manifest weight of the evidence. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45; *Jameson v*, 2020 IL App (3d) 200048, ¶ 47. A trial court's decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Verhines & Hickey*, 2018 IL App (2d) 171034, ¶ 51. To determine whether a judgment is contrary to the manifest weight of the evidence, we will review the evidence in the light most favorable to the appellee. *In re Marriage of Debra N. & Michael S.*, 2013 IL App (1st) 122145, ¶ 45. As previously stated,

under this standard, a reviewing court may affirm the trial court's ruling if there is any basis in the record to support its findings. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 87 Here, the court set aside the 50/50 parenting plan and modified it such that Rodrigo would have the majority of the parenting time during the school year. Specifically, the court modified the parenting time to provide that during the school year, Jeannine would have the children on alternating weekends from Thursday after school/camp through Tuesday morning drop off at camp/school, with Rodrigo having parenting time at all other times. The trial court's decision was not against the manifest weight of the evidence.

¶ 88 "[C]ourts have traditionally viewed 50/50 joint parenting time with caution" and "[i]n cases where the evidence clearly showed that parents had too much animosity to be able to cooperate, 50/50 arrangements have been set aside." *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 47. Here, the evidence clearly shows that the parties were unable to effectively communicate and cooperate. The GAL concluded in his report that "[j]oint parenting requires extensive communication and cooperation between the parents, both of which are sorely lacking in this family" and that he had not witnessed a "single functional conversation" between the parties. The GAL also stated that the parties' communication styles were incompatible, and they had "no ability to substantively communicate, or even to have an actual civil conversation, and as such the cooperating and coordination necessary to equally share parenting time is severely lacking." Likewise, in Shapiro's written report, he stated that the parties had spent most of the two years post-decree in "ongoing conflict and/or litigation," they had "essentially been engaged in litigation the past four years," and two GALs appointed in the case could not resolve the conflict. Shapiro further stated that the parties demonstrated a "remarkable inability to communicate and cooperate in day-to-day minor decisions, let alone some of the more

significant decisions" in the children's lives. At trial, Shapiro testified that he had not witnessed a single functional conversation between them. Accordingly, the evidence shows that the parties had been in an ongoing post-decree conflict and were unable to effectively cooperate and communicate.

¶ 89    Further, the record shows that children were negatively impacted by the parties' ongoing conflict and inability to cooperate. As previously stated, the GAL testified that since the entry of the parties' divorce, E.D. was "dealing with a lot of problems," L.D. was in a "crisis," and these issues were caused by the parties' conflict and the post-decree litigation. Likewise, Shapiro testified that the parties' conflict flowed down to the children and caused distress. In his written report, he noted that the acrimony between the parties negatively affected the children's development, and they both were "struggling with some significant psychological problems." Further, the GAL testified that "doing nothing is not a solution for these children." Accordingly, given the parties' contentious relationship and post-decree conflict, which negatively impacted the children, the court's decision to set aside the 50/50 parenting plan, which requires communication and cooperating, was based on the evidence and was not unreasonable nor arbitrary.

¶ 90    We note that the record shows that both parties had a good relationship with the children. Indeed, Shapiro testified that both parents had a warm, bonded, and attached relationship with the children. However, "[a] 50/50 arrangement is not a substitute for making a difficult choice between two good parents, especially where such an arrangement may add to the insecurity, which is frequently experienced by children of divorce." *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 52.

¶ 91    In addition, in modifying the parenting plan and awarding Rodrigo the majority of the parenting time during the school year, the court found Rodrigo credible and that he acted in the children's best interests. The court also found that Jeannine had precipitated the majority of the post-decree litigation, she actively and consistently discussed parenting issues with the children that placed them squarely in the middle of the parties' battles, and she undermined Rodrigo's day-to-day decisions. There is support in the record for these findings. With respect to Rodrigo, the GAL stated in his written report that "[a]lthough Rodrigo has overstepped his authority on implementing medical plans for children, his actions have generally been well reasoned and in the children's best interests." As for Jeannine, the GAL stated in his report that Jeannine discussed parenting and financial issues with the children "extensively" and she had "discussed the conflict with them a lot," which was putting the children "squarely in the middle of this conflict." Shapiro testified that Jeannine talked to the children too much about the conflict and agreed with the statement in the GAL's report that Jeannine did "not respect boundaries, either the boundaries between her home and Rodrigo's or the boundaries of what is appropriate to discuss with the children." He agreed with the GAL's assessments that "Jeannine actively and consistently discusses issues with the children which places them squarely in the middle of their parents' battles." The GAL also stated in his report that it was "far more likely that Jeannine" discussed the Allocation Judgment with the children than Rodrigo did.

¶ 92    Jeannine asserts that there was conflicting testimony between the parties and that the only evidence the court relied upon to support its decision was Rodrigo's testimony, whom both the GAL and Shapiro found to have equally contributed to the parties' issues. We acknowledge the evidence supporting Rodrigo's role in the parties' conflict and inability to effectively coparent, communicate, and cooperate. However, as a reviewing court, we may not reweigh the

evidence, assess witness credibility, or set aside the trial court's decision simply because a different conclusion could have been drawn from the evidence. See *Jameson*, 2020 IL App (3d) 200048, ¶ 51 ("It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence.").

¶ 93    We next address the trial court's ruling that modified the Allocation Judgment by giving Rodrigo sole decision-making authority for decisions related to medical, education, and extracurricular activities. To determine the allocation of decision-making responsibilities under section 602.5(c) of the IMDMA, the court shall consider all relevant factors, including:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;
>
> (5) the level of each parent's participation in past significant decision-making with respect to the child;
>
> (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;
>
> (7) the wishes of the parents;
>
> (8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2020).

¶ 94    As previously stated, as a reviewing court, we will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless that decision is against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048, ¶ 47. "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Id.* ¶ 50.

¶ 95    We find that the trial court's finding that it was in the children's best interest to modify the Allocation Judgment by giving Rodrigo sole responsibility for all major medical, educational, and extracurricular activity decisions is supported by the evidence. As previously

discussed, the evidence showed that the parties could not effectively communicate or cooperate, and they consistently disputed and litigated medical, educational, and extracurricular decisions. In Shapiro's written report, he stated the parties were engaged in ongoing conflict and litigation for two years post-decree and the parties disagreed about multiple medical issues, including the administration of medicine, therapists, vaccinations, and day-to-day health care of the children. The parties could not work together to address decisions regarding whether E.D. could play football and which school L.D. should attend and sought court intervention to address these decisions.

¶ 96        Moreover, with respect to medical decision making, the evidence shows that Rodrigo made well-reasoned decisions and that Jeannine was sometimes slow to respond. The GAL testified that Rodrigo acted in the children's best interests with respect to their medical needs, his medical decisions were generally "well-reasoned" and "proactive," and he "acted "responsibly in terms of the children's needs." The GAL also stated in his report that Rodrigo was "more proactive in addressing medical issues (therapy, vaccines)." As for Jeannine, in the GAL's written report, he stated that Jeannine "at times may lag in implementing [proper] medical care" and may be slow to respond to medical issues. Shapiro testified that the incident where L.D. made statements in the outburst about how dangerous action may be taken to produce injury needed to be addressed and the GAL testified that, other than calling Shapiro, there was no evidence that Jeannine took action after this incident until Rodrigo filed the emergency motion.

¶ 97        Accordingly, under these circumstances, we cannot find that the trial court's decision to give Rodrigo sole authority for all major medical, educational, and extracurricular decisions was arbitrary, unreasonable, or that an opposite conclusion is apparent. Thus, the trial court's decision was not against the manifest weight of the evidence.

¶ 98 Lastly, Jeannine contends that the trial court completely disregarded the GAL's and Shapiro's findings and recommendations, which were credible, uncontradicted, and unimpeached and that it abused its discretion when it rejected their testimony. We acknowledge that the trial court's determination to modify both the parenting time and the allocation of decision-making responsibilities differed from the recommendations of the GAL and Shapiro, the section 604.10(b) evaluator. However, the trial court "is the ultimate fact finder in a child custody case, not the expert witness." *In re Marriage of Saheb & Khazal*, 377 Ill. App. 3d 615, 628 (2007). Further, the court has discretion to seek independent expert advice, but it is not bound to abide by the opinions or recommendations of the experts it appoints. *In re Marriage of Wendy L.D. and George T.D.,* 2017 IL App (1st) 160098, ¶ 88. Rather, experts and consultants are advisors to the court, and it is within the trial court's discretion to accept or reject some or all of the advice within the parameters of what is reasonable under the facts of a certain case. *Id.* Here, although the court's conclusions did not reflect the GAL's and the section 604.10(b) evaluator's recommendations, the trial court was free to accept or reject some or all of the advice, and there was sufficient evidence, as described above, to support the trial court's findings and conclusions.

¶ 99 In addition, the court acknowledged in its order that it was not following the recommendations of the GAL and Shapiro and it explained its reasoning as follows:

> "This Court's experience during the entirety of this litigation including the six months
>
> since the 604.10(b) report was released, in conjunction with its finding that the minor
>
> children are suffering emotionally from the destabilization caused by their parents'
>
> conflict, leads it to step beyond the recommendations of its own expert and the GAL."

Accordingly, under the deferential standard of review, we cannot find that the court's judgment was against the manifest weight of the evidence simply because it did not follow the GAL's and the section 604.10(b) evaluator's recommendations.

¶ 100                                    III. CONCLUSION

¶ 101       In sum, the trial court's ruling that modified the Allocation Judgment is not against the manifest weight of the evidence. The judgment of the circuit court is affirmed.

¶ 102       Affirmed.